You can wait a minute, it's all, there's a lot of screen going around behind you. Thank you, Your Honor. Okay, I think we're ready. Good morning. Good morning, Your Honors. Amy Cleary on behalf of Michael Burciaga. I'll reserve four minutes for my rebuttal and we'll watch my call. How many for rebuttal?  Okay, thanks. In this jury trial appeal, I'd like to focus on two issues unless the court directs me otherwise. I'd like to first address the jury instruction error regarding the element of malice and I'd also like to address the government's failure to prove premeditation beyond a reasonable doubt. Time permitting, I'll also address the effects of this on count two. With regard to the instructional error, there are two principles that should guide this court's decision. The first is that the constitutional due process clause required that the government prove all the elements of the offenses beyond a reasonable doubt. The second principle is that when there's evidence of heat of passion or sudden quarrel, Supreme Court case law, this court's case law, and case law from the other circuits all require that the jurors be instructed that the government bears the burden of proving the absence of heat of passion or sudden quarrel beyond a reasonable doubt. Unfortunately, that did not happen in this case. The district court did not instruct jurors that the government bore the burden of proving heat of passion or sudden quarrel. So initially, the government wasn't going to give the instruction. Is that correct? Initially, the district court was going to give the instruction, Your Honor. The reason that the ---- No, no, no. On the heat of passion. Initially, there wasn't going to be heat of passion and then there was a heat of passion. Right? No? No, Your Honor. What am I ---- From the outset, that was Mr. Bersiaga's defense. So that was always something that was before the court. Well, he was always claiming that. But we have to decide. You're entitled to the instructions if there's evidence to support it. So the issue seems to turn on to me whether there was sufficient evidence of provocation to entitle Mr. Bersiaga to the defense instruction. And in ---- can you tell me what evidence in the record there was that supported that because I didn't see there were words exchanged, but I didn't see any physical altercation before he grabbed the knife and started stabbing her. So there were words. Certainly, Your Honor. And I'll direct Your Honor to 1 ER 38, and that is where the district court addressed the evidence that she believed in her discretion supported that. And that included more broadly this couple was in the midst of determining whether they were going to provide any care for this fetus prior to delivery. So this was a larger discussion. But when Ms. Davis told Mr. Bersiaga, I don't want your baby, she is conveying to him very provocating language that I'm not going to take any medical steps to try and save what is a very dismal diagnosis. But what ---- I guess can you give me, you know, so those are the facts. Those are words. It's not like she, you know, was holding a chair or she was holding a bat at that point or anything like that. I don't want your baby. And then he goes and stabs her a whole bunch of times. I think that ---- So, you know, if that ---- me asking you a hard question is provocation to start stabbing me, you know. That's the, you know, so that I'm wondering, you know. Well, Your Honor brings up a good point. We're not talking about name calling. We're not even talking about racial slurs. We're not talking about just mere words that could offend somebody. We're talking about telling the father of your child, I don't want your baby, which in the context of this specific case was telling him I'm doing palliative care, if anything. I'm not going to take steps to have a cardiac thoracic surgeon available to try and save this baby. I don't want this baby. And for someone ---- So then the response is, well, let me kill you. You're the carrier of this baby. I just find that a little bit difficult to find that as provocation of intent and to justify killing the carrier of the baby that Mr. Berziaga was caring so much about. Which is the very heart of the heat of passion. When someone ---- Let me ask you something. Premeditation requires planning, deliberation, forming the intent to kill, considering the intent to kill, being fully conscious of the intent to kill. How is that consistent with heat of passion? How can you have both in the same person at the same moment? Premeditation has ---- The case law is clear. Malice is negated by heat of passion. Premeditation, you don't get to that consideration until you first have proof that this was intended with malice. When heat of passion negates malice, there ---- Then you never get to whether it's a ---- it's not a murder. Correct. It's not a murder. Because first or second-degree murder requires malice before thought. First-degree murder requires premeditation. Correct. So, but I think what Judge Koh is saying here, this jury did find that he premeditated, and I think a lot of the instructions, I mean, I heard them and gave them a million times, but they all take on a different meaning in every case, that he left the room to go get the knife, right? And then he came back and stabbed her a number of times, and then didn't he leave again because something happened to that knife and get another knife, and then things went downhill continually, right? There was conflicting testimony as to that, Your Honor. But obviously, if you are looking for sufficiency of the evidence on the premeditation, you have to look at the facts that would be most favorable to that particular verdict. And how many stab wounds did she have? She had 18 stab wounds, Your Honor, and I believe 20 individual or superficial incised wounds. Okay. I guess, you know, let me clarify my point. I'm looking at Frady, okay? Frady says, look, if a jury found premeditation, deliberate planning, they're not going to find heat of passion. They're not going to find the provocation. And if I look at the jury instruction you wanted, okay, for count one, third element is the killing was premeditated, right? But then you wanted this whole paragraph at the end, which the district court didn't adopt, that said, you know, provocation, heat of passion. And what I'm saying is in Frady, the Supreme Court found that, hey, if a jury found premeditation, they're not going to find heat of passion, so there's no prejudice here. And if I look at the Ninth Circuit case, People of Territory of Guam v. Quichocho, that comes to the same conclusion. If a jury is going to find premeditation and deliberation, they're not going to find passion and provocation. So where is the – if – assuming there's error here, where is the prejudice? Because if the jury found premeditation, they were not going to find provocation and heat of passion. That was my point. I understand now, Your Honor. Let me address Frady. Frady makes clear in several parts of the decision and also in footnote 19 that this case, the Frady case, would have been different had the defendant challenged malice or had there been any evidence of self-defense or heat of passion. That is why each case is on its own merits. Well, I'm going to just read from Frady. Plainly, a rational jury that believed Frady had formed, quote, a plan to kill, a positive design to kill, end quote, with, quote, reflection and consideration amounting to deliberation, end quote, could not also have believed that he acted in, quote, sudden passion aroused by adequate provocation causing him to lose his self-control, end quote. So where is the prejudice here if the jury found premeditation? Because the premeditation instruction did not advise jurors that the government had to prove the absence of heat of passion. If this Court were to undo Mulaney v. Wilbur, United States v. Lucina, and even Frady and say that the two were inconsistent, then the Court would also need to take the additional step to say, well, maybe the government doesn't have to prove the absence of heat of passion for malice, but it does have to, jurors do have to be told that they, government has to prove the absence of heat of passion for premeditation. It's not the law, but at some point due process requires that the jurors be told what the government's burden is on each of the elements. So, Judge Koh, whether it is in accord with circuit authority that it must be tied to malice, or if it's viewed as theoretically something that could be inconsistent with premeditation, jurors still need to be told because we have no idea how jurors would have responded if the government was held to its burden to prove that this particular circumstance with these particular people was something that was a heat of passion that negated the count one murder count. This is always, I've always found this to be a tricky area. Is there a difference between the legal standard used to determine whether a defendant is entitled to a lesser included offense instruction and whether a defendant is entitled to a defense instruction like the one at issue here? It seems to me both standards require some evidence from the defendant, but is the standard the same? Do you know what I'm saying? I do know what you're saying. It's interesting. I think that the sum evidence standard, I think, is an across-the-board generalization as to what's necessary. So I'm not immediately seeing that there is a different standard, per se, because even with lesser included, the courts would have been obligated if they found sufficient evidence of lesser included, even if the defendant didn't want it. So I think it's a very low bar to get the lesser included and get the defense instruction, but the difference is the defense instruction here, as the Supreme Court said in Mulaney v. Wilbur, is part of the element of malice. So to not give that instruction here, regardless of whether there were lesser included, is reversible error on this record. I'd also like to address the government's failure to prove premeditation. We have a defendant who was highly intoxicated, who came to his girlfriend's home after having consumed methamphetamine in the last few days. They get into a disagreement. They are struggling with a fetus who was diagnosed with trisomy 18 and is very likely going to die before delivery, and they're disagreeing on how to handle this very difficult situation. He did not walk into his home that night with any intention to do any harm to anyone. What he wanted to do, in his words, and he gave a very lengthy confession as to what happened, is he wanted to come home. He wanted to hold Ms. Davis. He wanted to go to sleep. When that didn't happen, the two engaged in additional conversation. She calls him some nasty names, and she tells him she doesn't want his baby. When he then became enraged, there is not sufficient evidence that he planned to do anything to harm her or the fetus. Well, I just got to play the devil's advocate here, because any time you do a sufficiency of the evidence, and I think you were sitting out there when people say there's no evidence or there's not. Okay, but what we have to look at is every piece of evidence that supports a verdict and where an inference can come from that, and the type of things that don't go in your favor. Now, arguably, were you the trial lawyer? No, Your Honor. Well, but obviously you make all those arguments at trial, and someone could have said, okay, I don't think you could have formed malice. I don't think you could have premeditated any number of things and could have come back with a verdict of voluntary manslaughter. But that didn't happen here. All those arguments were made. But then you don't have to stab someone this many times. You don't have to leave the room and come back and go think. There's a lot of things there that a jury could look at differently than the way that you're saying that. They could have bought your argument. But on the other hand, they could have bought the prosecution argument. Yeah, maybe he didn't say, I want to kill her and the baby today. He wanted another result. But when he wasn't getting, when the argument wasn't going where he wanted, then he leaves the room, goes and gets a knife, stabs her a whole bunch of times, leaves the room again because the first knife break or something happened like that, and then he comes back again, continues on the whole thing, and then one of the kids, and it's in front of what the children, the other children in the house. So they could look at it differently. So there is some evidence that because premeditation, it says it's no period of time. It could be ever so slight. And he had to go get the weapon. He had to leave the room. He left the room. He came back, continued. I have trouble with the sufficiency of the evidence on that. Let me try and address your concerns. Yeah, I just want to be honest. Absolutely, and I appreciate that. When looking at premeditation, what we have here is a scene, basically. We have a bedroom and a kitchen, and they're connected by a wall. And we put in our excerpts of record ER 2368, which shows how small this home is. When he ran, and he ran from the bedroom to the kitchen, whether it's once or twice, the government did not present sufficient evidence to show that maybe that was enough time perhaps, but that he actually stopped and considered. And I'll compare this case to United States v. Begay, which had a fairly similar situation, but the court was looking at how was the defendant acting when he went from the victim's car in Begay to his truck to get the rifle, and he came back and shot the victims. What was very important to this court in Begay was how the defendant walked to the truck and back to the victim's car, and that there was a lack of evidence that the defendant was agitated or upset. What we have here is Mr. Bersiaga saying he ran into the kitchen, one of the child witnesses saying he ran to the kitchen, both child witnesses saying that they did hear an argument between the parties. This was a relatively quick, rageful event by Mr. Bersiaga that spanned until the time that he ran out of the house and he finally understood what he had done. Wasn't there also some additional time for him to consider because she barricaded the door and he had to break through the barricade and kick the door in to come in and kill her, finish killing her with the second knife? I would submit, Your Honor, at that point, the argument and the quarrel and the fight between the two is still ongoing. It's not as if she locked him out of the house and he had time to walk around and be outside and get some cool air and calm down. This is all happening rather quickly in the couple. But our case law says that premeditation can be formed very, very quickly. So even if we accepted that the argument they had was sufficient to be heat of passion and that he initially attacked her without premeditation, the events continued. I don't think our case law says you have to have time to go outside and smoke a cigarette and get some cool air and calm down. I mean, he had time to go to the kitchen, get a second weapon, come in, break down the door, and then kill her. And I think that's what comes down to what was his state when he went from the kitchen. And it was a – he ran both directions. He was very upset. While the government doesn't have to show he went outside and smoked a cigarette, they do have to show that he actually stopped and considered. And because of the nature of the way that – But how did they show that, right? We can't read his mind. The jurors can't read the defendant's mind. So they're looking at, as you said, in Begay, the way he walked here. Can't they not look at his leaving the room and returning? They did in Begay, and if you did that here, when someone is running back and forth, that is not indicative of someone who's stopping to take time to consider the consequences of their actions. And in Begay, they also looked at how did the defendant act afterwards. In Begay, the defendant told the witnesses, don't want to talk about it, be quiet about it. Here we have Mr. Bersiaga coming, walking back on his own to the police, hands up in the air. I did it. I'm here. He proceeds to the hospital, gives a full confession. He explains, I didn't think about this. I didn't plan this. I didn't want this. I love her. And, yes, I understand the ironic nature of the offense, but that is part of the reason why this is so difficult. If we were to find that premeditation in a heat of passion argument in a situation like this, where there is no reasonable inference that someone actually stopped and thought about what he or she was doing, then there is largely no difference in the evidence that needs to be presented between second- and first-degree murder. And we know that there is. We know that this premeditation needs to be carried beyond a reasonable doubt, and the government did not do that. Now, I'll just speak briefly.  Can I ask you a question on the provocation? So that's an objective standard, but you're asking us to take into account a lot of subjective circumstances about Mr. Bersiaga. He had used meth that day. He was intoxicated. So sort of help us think about what's the legal analysis here. Do we take into a lot of Mr. Bersiaga's subjective situation in determining whether, you know, there was provocation here? When looking at the what he knew, I think you take what an objective person would have done under the circumstances with what he knew. With regard to the intoxication, I think that the case law suggests that ---- Well, wouldn't it be whether a reasonable person would be provoked under these circumstances? Yes. Yeah. Not whether he was. He clearly was provoked. Correct. And if I misspoke, I apologize to you. It has to be, but you've got people sitting up there on the jury box, 12 of them, thinking to themselves, well, yeah, I wouldn't be happy that the mother of my child cut me out of going to the doctor's appointment, that we don't really agree on whether we give palliative care or whether we're confronted with a horrible situation about a baby that's probably going to ---- could die before delivery, but then also, even if it's delivered, there's nothing that they can really do to save it. It's going to die. It's going to die. It's going to die. So the question is how you get there. So it's a horrible situation. But you've got all those people sitting up there, and they're thinking, well, what would I have done in that situation? And obviously, they're thinking to themselves, well, stabbing someone a whole lot of times in front of three children, that barricade, then I come back in and try it again, and one of the kids is trying to stop you with a bat, and you still keep going, and they obviously didn't buy it. They're thinking from their standpoint, that's awful, but I wouldn't have done that. And I appreciate that, Your Honor. And that's why I began this discussion this morning with if you're going to get there, you need to properly instruct the jury. And because they didn't on malice, this requires reversal. And the reason it will also impact count two is because the punishment for count two is mirrored by the punishment that the jury believed he undertook. So if the jury believed he undertook murder as it was explained to them, that's why he got the life sentence for the count two. But because count one needs to come back with a correctly instructed jury, count two should also be vacated, and I'll reserve the rest of my time for rebuttal unless the court has additional questions. Oh, yeah. Let me ask you. I can ask the government, and you can come back on this. There was a discrepancy in what the oral and the written, and I think the government's point is it was just a clarification so it doesn't have to go back, and your point is that the court has to clarify that and it has to go back on remand regardless of the other issues. It would have to go back on remand, Your Honor, because what the court said was not ambiguous at sentencing, and the only way you get to clarify something is if it was ambiguous. Because her oral pronunciation doesn't match what the written was as far as which count two would run consecutive to or concurrent to for the remaining, that needs to be corrected. Okay. I'll give you three minutes for rebuttal. Thank you, Your Honor. Good morning. Good morning. May it please the court. Peter Walkinshaw on behalf of the United States. Unless there are any immediate questions from the court, I think I'd start by just summarizing quickly the facts and evidence that support the jury's conclusion that this is a premeditated crime. On the night of the murder, the defendant announced that he would kill his victim and stabbed her in the arm hard enough that his knife broke. He then went to the kitchen to retrieve another while the victim and her children barricaded themselves in the victim's bedroom. The victim's eldest daughter spent a minute and a half on the phone with 911 before Bursiaga was able to enter the room. Now, it's not clear how long they were in the room prior to that, but we do know that the children's seriatim gathered each other into the defendant's bedroom before the door was barricaded. After a minute and a half on the phone, and I recognize that the 911 call is a hard listen, but from that 911 call, we know that for five subsequent minutes, Bursiaga attacked the victim here. And from the testimony, there's some dispute with the defense as to whether or not Mr. Bursiaga went back once to the kitchen or twice. And while obviously this Court will draw inferences in favor of the jury's verdict, I think if you look at the citations that the defense provides, they actually support the conclusion and the testimony given by the victim's eldest daughter that Bursiaga repeatedly went back to the kitchen to retrieve knives to commit this crime. And I'll return to that briefly, but just continue. He also broke the lower half of a dresser that Ms. Davis and her kids were using to barricade the door. He did, Your Honor. He kicked through the door. He kicked through the door. He kicked through the door. So after returning, after stabbing the victim in the head and torso, losing his knife, and then again returning to the kitchen after the children had tried to fight him off, he returned for the third time and completed the murder, at which point he fled the residence. When he returned to the scene of the crime shortly later, he told police that he knew what he had done and that he was going to get 20 years for it. And then when asked the following day, having had time to sleep off whatever substances he had ingested, he told the interviewing FBI agent that he didn't snap. This is just more than sufficient evidence to support the jury's finding of premeditation. I'm happy to answer any questions. Well, the instructional situation is a little more convoluted to me from the standpoint that, obviously, they were confronted as a couple with a horrible situation with a baby that just faced a doomsday verdict. And it doesn't sound like really any of the alternatives were really very positive or very had a – but the victim had cut Mr. Bursiaga out of going to the last doctor's appointment. So he was already mad about that, right, because he had a different view about how they should – what they should do in the interim, whether palliative care or when – how they should let this work out. So what is your position about – there was no – she was not – it seems undisputed. She was not physically threatening to him or whatever. She said some words that – they had an argument, and it was a really difficult situation for any couple to have to deal with. Should the court have given that – the instruction, or is that just as a matter of law not enough to merit a heat of passion? Your Honor, the government objected to the giving of the heat of passion instruction. The government's objection is set forth in the record at page 2083 on the basis that there's no evidence that could support – that from which a jury could – But the district court found that there was. That's correct, Your Honor. So why isn't it error that the judge didn't include the statement, it's not first- or second-degree murder, if Mr. Bursiaga acted upon a sudden quarrel or heat of passion or otherwise acted without malice aforethought? She should have given that instruction. Well, Your Honor, Mulaney v. Wilbur, which is where this line of cases come from, say that this instruction needs to be given in cases where the issue is fairly presented. Right. But here we have a district court that said that the defense did fairly present it. Right. So I know you disagree, but we have the court finding it was necessary but not doing it.  Your Honor, I believe the district court didn't identify the evidence from which a jury could rationally find that Bursiaga had been adequately provoked in this instance. And we would put forth that it simply just doesn't exist in this case. So if we have to get into, if there was error, it seems strange to me, the Mulaney case seems very strange to me because it does seem, I don't, it's hard for me to see how a jury would find someone premeditated. But yet, on the other hand, I mean, they look at all the facts and they just look at everything, and that obviously you don't find someone, in my view, guilty of malice of forethought and then premeditated murder if you really thought that they were acting in the heat of passion. But there does seem to be some case law that says within that, you're supposed to prove beyond a reasonable doubt that the person didn't have malice of forethought. So how does the harmless error analysis work there? Right. So I think there are two separate questions, Your Honor, going on here. So Mulaney v. Weber says that this instruction needs to be given when the issue is fairly presented. And we certainly don't dispute that. But even then, it is —  We could find, if we wanted, and I don't know what we're going to do because we don't conference before we come here. We could say to the jury that the judge didn't have to give it, so end it there. And we — But if we don't and say, once you did give it, you have to give the other part of it. Assuming the heat of passion instruction was appropriately given in this case, Your Honor, it's still the form of the instruction. And in this case, it would be the lack of the instruction to the jury that the government bears the burden of disproving heat of passion beyond a reasonable doubt. That's still subject to harmless error review. And in this case, in order to determine, you know, whether that error is harmless, the question the Court really only needs to ask is, what is premeditation and what is heat of passion? Now, often in the case of law, heat of passion isn't given any further definition beyond its sort of common everyday meaning. But when it does, it makes it very clear that a heat of passion is an absence of an ability to think clearly. Now, in — Well, heat of passion negates malice, right? Isn't that what it negates? Well, it's — yes, Your Honor. And then because — and therefore, if you don't have malice, you never get to premeditation. Well, it's a partial defense or partial justification. I think the phrase negates malice is sometimes used, but I believe in the literature it's more commonly understood as basically a justification for why something like that happens. A defendant can't properly be held responsible for his actions when he's in such an emotional state that he can't properly reason. But again, when it — when defined beyond it's just the plain language of the term, and I believe it's United States versus Boudreau in our papers. It's also in United States versus Martinez. It's an emotional state that causes a defendant to lose self-control and act on impulse without reflection. And I think really the key aspect of that definition is the phrase without reflection. That's really what the heat of passion is. If a defendant has reflected, if they've — and this is the words of the jury instructions — if they are fully conscious of their intent and have considered the killing, they simply cannot be in the heat of passion. And by proving beyond a reasonable doubt that Bursiaga premeditated this crime, the government — the jury found, without having to be instructed by the court, that the government disproved that he was in a state of mind in which he couldn't think or reflect. Well, it is implicit to that, so I don't understand why that instruction — I think that case is a stupid case, but it is a case that we have to follow. Well, to be clear, Your Honor, Mulaney v. Boudreau does not deal with premeditated murder. So it's not a case in which the Supreme Court considered, you know, whether or not the error was harmless. It really — it was a main statute which, by operation of law, placed the burden on the defendant to prove that he was in the heat of passion to provide a defense to murder generally. What the Supreme Court said was that violates due process. You can't do it that way. But what it did not say is this defendant was convicted of first-degree murder, and we find that that error was not — we find that error was not harmless and therefore reversible. That's nowhere in Mulaney v. Wilbur. And so I would say, while we don't disagree with — we obviously don't disagree with Mulaney v. Wilbur. It's a Supreme Court case. It's a Supreme Court. But it doesn't speak to the issue here, Your Honor. It doesn't speak to what — So you're reading Mulaney to say, if we get to the point where the instruction was given, Mulaney would require this to be given. But what you're saying is it does not — that error is not a — what — an error that can't be reviewed for harmless error. And in this case, they could have only gotten to premeditated first-degree murder without rejecting all of that. Precisely, Your Honor. Both the parties agree that this is a — this is — if an error, which, again, we dispute, but assuming that the district court should have given this instruction that the government bore this burden, parties agree that it's subject to harmless error review, harmless gun or reasonable doubt. And the analysis that the Court conducts, and these are from the cases cited in our papers, is it looks to what the jury actually found. And if the jury found the thing that it was not instructed it needed to find, then there's no error. There's no harm — there's no prejudice to the defendant that would subject their conviction to reversal. So on the oral pronouncement, and the written judgment appear to say different things. That's correct, Your Honor. Can you explain to me how they are the same, or alternatively, how the written judgment clarifies the oral pronouncement? Certainly, Your Honor. And then if we find — if we don't agree with you and find the written judgment and oral pronouncement to be inconsistent, what's the proper remedy? So, Your Honor, if the — the oral pronouncement is ambiguous, and the reason that it's ambiguous is because it says that count two is both concurrent to and consecutive to count three. That's the problem, is that when announcing count three, the Court said this will be consecutive trial or counts. But then when announcing count two, the Court said that 10 years will run consecutive and the remainder will run concurrent to all other counts. And I think part of this arises from the fact that two of these sentences are life sentences. And so, you know, just conceptually, as a practical matter, doesn't actually make a difference in terms of the time that the defendant will actually serve. But there is an ambiguity in terms of the Court's intent regarding the — Well, but always down the line, one life sentence could be overturned. Oh, certainly, Your Honor. I don't dispute that. And then that if they were — that, you know, so it can have implications. Right. I beg your pardon, Your Honor. I don't mean to suggest that it couldn't. I'm just sort of trying to explain what I believe is fairly right to be the origin of the error. But again, it's ambiguous because what the Court did is it said that count two is both consecutive and concurrent to count three. I think this is honestly just most fairly right as a slip of the tongue by the Court. And then it clarified that ambiguity in the written judgment, which under this Court's precedence is entirely appropriate for it to do. So we would say — If we want to be sure, wouldn't — should we just send it back to the judge and say what did you mean here? Well, Your Honor, I think the Court made clear what — I mean, that's in some respects an important purpose of codifying the judgment in a writing, is the Court can clarify what it meant. And it did here. And so because — But a lot of times what you do is you say it and then a clerk prepares something and then you sign it later. That's true, Your Honor. So and — I think the signing — And so — I think the signing is important, Your Honor, though I think we should assume that the district court in this case reviewed the papers before signing them. And again — Yeah, but sometimes you think you could be — we see what we want to see. We see what we think we did. So — I don't dispute that, Your Honor. But I think under this Court's precedence, it's very clear that if the oral pronouncement is ambiguous, that it's entirely appropriate for the written judgment to clarify it. And that's what happens. There's no — there's no suggestion that there's any ambiguity in the written judgment. It's crystal clear. And because there's no ambiguity in the written judgment and there is ambiguity in the oral pronouncement that the written judgment resolves, there's really no need for remand here. The district court's made its intent clear. So you're sure that the district court didn't mean what the district court said in the oral pronouncement and that the written one — you've got the mind reader here going on. Well, Your Honor, the district court could not possibly have meant what it said in the oral pronouncement because it says two things about count two that are mutually exclusive, that it's both consecutive to count three and concurrent. So the oral pronouncement, for lack of a — doesn't entirely make sense, but the written judgment does. And it's basically — it follows from — if one assumes that the oral pronouncement arose from a slip of the tongue by the district court, then the oral pronouncement would make very clear what the district court actually meant. And it's — it is a fair reading of what one can infer the district court intended when it made its oral pronouncement. Now, if I'd rather really know what the district court's meant, we could remand it, couldn't we, in the district court? I mean, the district court's not going to make something up here. Certainly, Your Honor. I think if that's the sole issue on which this Court intends to remand to the district court, I think the government would not protest too strongly, although we think it's unnecessary. Why isn't it a constructive amendment to count two to include involuntary manslaughter as a predicate offense when it has a different mens rea from murder and voluntary manslaughter? So the Supreme Court and this Court's precedents are quite clear that an indictment, which, again, conceptually is a set of allegations, is improperly amended when those allegations are expanded. Now, while in some respects the defense makes the point that the defendant's liability was in some sense expanded by allowing manslaughter to be a predicate account offense, predicate of count two, if you consider the indictment, again, as a set of allegations, what that's done by including manslaughter as a predicate is removing one allegation from the elements of premeditated murder. So the elements set forth in count two are defendant committed premeditated murder, it caused the death of an unborn child, it happened in Indian country, and the victim was an Indian. So within the ---- But what we're talking about here, though, is the inclusion of, in element one, defendant committed the crime of murder or manslaughter as alleged in count one, which would include both the involuntary and the voluntary manslaughter. Correct, Your Honor. And, again, both voluntary and involuntary manslaughter are lesser-included offenses of premeditated murder. And so the allegations contained in voluntary and involuntary manslaughter are all contained in the allegation of premeditated murder. You just subtract out the mens rea, effectively. So it's, in fact, one fewer allegation that the grand jury ---- really, the question is, did the grand jury find probable cause to allege all the facts necessary to support this charge? And so the ---- with district court found ---- I beg your pardon. Did the grand jury found that the ---- that all the facts necessary to support a charge of premeditated murder as a predicate for count two were supported by probable cause? They necessarily found that all the allegations necessary to support voluntary manslaughter or involuntary manslaughter, effectively, that he killed the victim unintentionally or that he killed the victim in a heat passion or any of the other means through which voluntary manslaughter might be achieved. But if ---- Sotomayor, did the defendant ask not to have those lessers? He did. Well, he ---- I beg your pardon. He asked not to have those lesser-included offenses as part of count two, but he asked for the jury to be instructed on those offenses with respect to count one. So there's no question the defense thought that these were appropriate theories here. It's just that he didn't want them included in the instructions for count two. Well, because if ---- well, if a defendant said after listening, you know, after the whole trial, and usually jury instructions, obviously, then you meet and the judge says, I'm going to give these instructions, and people have a chance to object. And let's ---- let's just say that a defendant felt like, well, I just don't think the prosecutor's proven what they've charged. They just haven't proven what they've charged, and I don't want any lesser-included offenses. So they could do that, right? I believe this Court ---- and I apologize, Your Honor, I don't have a case at hand. They could say, but it would generally not be under the ---- this isn't a situation of a whodunit. Correct. Well, let's just say after a whodunit that it was clearly a ---- the defense felt pretty comfortable that they hadn't established that the client had done it. So they don't want lesser-included. They don't want to give the ---- they're just going all or nothing on the whole thing. But here, obviously, the facts are what they are no matter what. This defendant clearly did what happened here. It's a question of what is it at the end of the day. Was it a heat of passion? Was it a ---- was it a ---- they did ---- did they argue that he was not guilty at all? No, Your Honor. And again, I think ---- I take Your Honor's point. It's kind of all meshed together, and then so you don't want them on one count, but you do want them on the other count? That was effectively defense's position here, Your Honor, and I think the district was correct to reject that. Let me ask on the question about whether your office will provide key inculpatory information to the defense. I'm looking at Chief Judge Due's order, and she says, look, you may not be legally required to produce it, but, you know, it is going to lead to trial by ambush if you don't. Has your office implemented any changes that, you know, the assistant U.S. attorney said, you know, I don't include inculpatory evidence because I'd be recording an impractically large amount of information, but why not include the key pieces of evidence? If you're going to charge count two, you know causation of causing death to the unborn child is going to be a major element that you need to prove, and so why not include the key inculpatory information that you need to satisfy the elements of the counts you're charging? All right. And I think I'd start off, Your Honor, just by noting that this was not a deliberate decision by the government to not disclose this particular information. It's simply a implementation of the attorney's regular practice to attempt to abide by the rules. Now, but I don't mean to set your question. But this is what that attorney, that AUSA, said. She only ensures exculpatory or impeachment evidence is recorded, not inculpatory evidence. And I understand what you're saying. You know, they want to comply with Brady v. Giglio obligations on the exculpatory and, you know, exculpatory evidence, but not to include the key inculpatory evidence in the government's, you know, 302's witness statements just seems to be not consistent with the government's role here, which is to be advancing justice, right, and to be making sure that the jury is able to fulfill a truth-seeking mission and function. Well, Your Honor, I'll just — I'll have to step a little bit outside the record here to answer the Court's question, but I'll just note that there has been continued development with the district court to — I believe the district court issued a discovery order in another case with the United States v. Spurlock to address the concerns here. I think, you know, forming a — it's difficult to know which evidence is going to be, you know, particularly key or how to delineate which inculpatory evidence is or is not subject to disclosure. But I would say, again, the government acted in good faith here. It continues to do so. But that is the second element, right, of count two. The defendant did thereby cause the death of a child who was in utero at the time the conduct took place. It seems that at a minimum, you should be providing witness statements that cover elements that you're intending to prove beyond a reasonable doubt at trial, right? Yes, Your Honor. And again, I think, you know, as the court, as the AUSA said at the hearing, these things are almost always covered by the investigative reports. In this case, I don't think there's any reason to believe this is anything more than an oversight. But again, the government is aware of its — Now, we're talking about the statement of the mother, the grandmother — Yes, who felt the — — that felt the baby move — — felt the baby move a day before. — at the day before. Yes, Your Honor. Because the defense was trying to prove that the baby might have already been dead. So — That's correct, Your Honor. So, again, I would say, Your Honor, this is something that we are working to address, that the district court is working to address. And again, the government, you know, as put forth in the — in the hearing, acted in good faith here. So the doctor's appointment had been how much before? It was five days prior to the — Five days before, and that — that was already — that the baby was alive. Correct, Your Honor. But — But the evidence says it's six days before. Why is there that discrepancy between five and six? So I think measuring the time, Your Honor, it's — I think the thing to remember is that while the murder happened on December 15th, it happened somewhere in the vicinity of about a half an hour after midnight. And so it's not like it's the next day — Got it. — effectively is what's happening there. Okay. So you're just about out of time. I thank the court for its time. We would ask the court to affirm the judgment in full. Thank you. Thank you. Thank you. Your Honors, the government is confusing and conflating premeditation and heat of passion. Heat of passion is specifically dealing with anger, rage. Premeditation deals with the planning. That is why the heat of passion goes to malice, because if you are enraged, you cannot form the intent to kill under the defense. For purposes of harmlessness, this court would have to ask, if the jury found the government did not prove the absence of heat of passion beyond a reasonable doubt, could the jury convict? And the answer to that is no. The harmlessness has to take into account what would have properly occurred. Because this goes directly to an element of the offense, this is not a harmless error. And with regard to the government's disclosure — So if there were less — there were also given — was it also given lesser included? Yes. And isn't my recollection, and admittedly, it goes back a bit to being a trial judge, but there's an instruction that goes along with that that says before you look at the lesser included, you have to find — you have to acquit the people of what they're charged with. Am I wrong on that? So that transitional paragraph did not occur here, but the verdict form at ER-333 specifically tells jurors if you agree that he was guilty of first-degree murder, basically stop there. So they wouldn't have gotten to the lesser included if they agreed based on — But there used to be an instruction that would say — it wouldn't be like, okay, we're going to send all these verdict forms back to you, and you can just pick what you want to do. There was an instruction with lesser included that said you must acquit the people of the greater before you look at the lesser. The district court here declined to give that transitional instruction, but the verdict form basically says the same thing to jurors. If you convict on count one, you're done. You don't go to the lesser included unless you don't agree on count one, first degree. Okay. With regard to the — Didn't they get a second-degree verdict, too? I'm sorry, Your Honor? Didn't they get a second-degree verdict, too? No. There was slashes through the lesser included that was meant — But couldn't they have found their client guilty of second-degree murder? They could have. Yeah. So there was a first degree, a second degree, and then voluntary. Because second degree would be without premeditation, right?  All the lessers were in there. Okay. With regard to the government's failure to disclose that the — Ms. Davis' mother alleged to have felt fetal movement the day before Ms. Davis died, I appreciate that the government is now relying on the district court for discovery orders to correct this issue in the future, but this did not help Mr. Bursiaga's defense team here. The government was well aware through the expert disclosures that one of the chief defenses was the government could not prove causation on count two given the trisomy 18 diagnosis and the more than 50 percent chance that this fetus could die at any moment, at any time, at any day. This was trial by ambush on count two. And the government should know better. And the government is expected to do better. And we would ask the court to find that just like in United States v. Powell, the government's conduct here was not becoming of what is expected of U.S. attorneys who know exactly what the elements and the evidence are and what the defense is. All right. Thank you, Your Honor. Thank you. Thank you both for your argument. This matter will stand submitted. The court's just going to take a short recess, five to ten minutes, so don't go far. We'll be back to hear the last case on calendar.
judges: CALLAHAN, BADE, KOH